IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37574-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG RUSSELL JUNGERS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Craig Jungers appeals the judgment and sentence entered following his plea of guilty to three counts of first degree child molestation. He contends (1) he was deprived of his constitutional right to retained counsel of his choice; (2) he was constructively deprived of legal representation in negotiating his guilty plea; (3) RCW 9.94A.670(4)'s provision that a sentencing court "shall give great weight to the victim's opinion" whether an offender receives the special sex offender sentencing alternative (SSOSA) violates separation of powers, and denying him a SSOSA based on

his victim's wishes constitutes cruel and unusual punishment; and (4) the trial court abused its discretion in denying him the SSOSA.

We find no error or abuse of discretion and affirm.

## FACTS AND PROCEDURAL BACKGROUND

In October 2018, then 17-year-old H.N.[1] reported to police that Craig Jungers had sexually assaulted her multiple times some 10 years earlier. She told police she did not previously report the assault because Mr. Jungers was a friend of her family. She changed her mind when she became aware that Mr. Jungers had befriended a 9-year-old girl who came from a broken home, lived with an elderly grandmother, and had spent time alone with Mr. Jungers at his home. She feared Mr. Jungers was taking advantage of the girl.

Having obtained a phone intercept order, law enforcement recorded a telephone conversation between H.N. and Mr. Jungers on October 22. Although Mr. Jungers initially objected to speaking with H.N. on the phone and insisted that they meet where they could not be monitored, he was gradually drawn into a conversation with her about how their sexual contact started and the molestation that had occurred. He claimed that H.N. had initiated the sexual contact. During the conversation, Mr. Jungers repeatedly expressed concern that he could go to prison for the rest of his life.

---

[1] We refer to juvenile victims using initials or pseudonyms. *See* Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), http://www.courts.wa.gov/appellate_trial_courts/.

2

The next day, as H.N. walked out of her house, Mr. Jungers slowly drove by. H.N. called her mother in a panic and her mother called police. Officers took Mr. Jungers into custody that day and on October 24, he was charged with three counts of child molestation in the first degree and one count of indecent liberties (forcible compulsion).

*2018 proceedings*

Mr. Jungers was represented by privately-retained counsel in all of the proceedings below. At his first appearance on October 24, he was accompanied by Bradley Barshis, who told the court that his firm would be filing a notice of appearance. A notice of appearance was filed on November 13 by Elizabeth Mount Penner, a lawyer with Newton and Hall, a Kent-based law firm. Mr. Barshis was also present at the arraignment, which took place on November 13, and he explained that he and Ms. Penner were with the same firm. The trial court set the omnibus hearing for January 8, readiness for January 28, and trial for January 30.

*2019 proceedings*

At the January 8 omnibus hearing, Ms. Penner appeared by telephone. The prosecutor, Carlee Bittle, informed the court that the parties were still in "discovery mode" and she was following up on material requested by the defense, so the omnibus

was being continued by agreement. Report of Proceedings (RP)[2] at 29. Ms. Bittle

reported that the defense had not yet set any interviews. Omnibus was reset to February

25, readiness to March 18, and trial, March 20.

At the February 25 omnibus hearing, Mr. Jungers was present but Ms. Penner was

not. Ms. Bittle explained that Ms. Penner had called the prior week to say she would be

unavailable but had been told that a continuance could be agreed on and had advised her

client of the agreed, continued dates. Mr. Jungers affirmed that he had discussed the

continuance with Ms. Penner and he signed the revised scheduling order. Omnibus was

continued to April 22, readiness May 13, and trial May 15.

At the April 22 omnibus hearing, Mr. Jungers was represented by a stand-in

lawyer not associated with Newton and Hall. Ms. Bittle informed the court that Ms.

Penner was requesting a continuance of trial to the first week of August due to her

involvement in a jury trial, her unavailability for the entire month of June, and her need to

interview witnesses in July. Ms. Bittle explained that the victim had her own reasons for

wanting to avoid a May trial date (she was graduating from high school) so the State had

no objection. Ms. Bittle stated, "I believe this should be the final continuance in this

matter." RP at 38-39. The trial court expressed displeasure that defense counsel had not

---

[2] All proceedings other than sentencing are included in a single, consecutively-paginated transcript which we refer to simply as "RP." The transcript of the sentencing is referred to as "RP (Sentencing)."

yet conducted any interviews, but continued the trial date to August 7. Omnibus was scheduled for July 22.

On June 20, Ms. Penner, who had evidently left the Newton and Hall firm, filed a notice of withdrawal and substitution of counsel, identifying Harry Steinmetz as "substituting attorney." CP at 19. Mr. Steinmetz appeared for the July 22 omnibus hearing. Mr. Steinmetz informed the trial court that although he had only recently joined Newton and Hall, he had met with Mr. Jungers, reviewed most of the discovery, spoken with the prosecutor, and "I do have a plan of where I want to go with this." RP at 47. He apologized for Ms. Penner "dropp[ing] the ball" but told the court "I think we've made more progress in the last month than has been made in the entire time of this case." *Id.* Ms. Bittle said she believed "a short continuance would be appropriate." RP at 56. The trial court continued the trial date to October 9, with an omnibus hearing scheduled for August 20.

At around this same time, Mr. Steinmetz was arranging for a certified sexual offender treatment provider to evaluate Mr. Jungers for purposes of seeking a SSOSA should Mr. Jungers plead guilty or be found guilty of the charges. The evaluation was funded privately by Mr. Jungers, with the understanding that the provider, Julie Crest, would initially forward her completed report only to Mr. Steinmetz. Ms. Crest conducted her first clinical interview and testing of Mr. Jungers on July 31. She performed a second clinical interview of Mr. Jungers on August 7.

5

The August 20 omnibus hearing was not attended by Mr. Steinmetz or Ms. Bittle. An associate of Mr. Steinmetz's appeared with Mr. Jungers and another deputy prosecutor appeared for the State. Mr. Steinmetz's associate told the court that Mr. Steinmetz would be involved in other trials "for quite a while" and was asking that the trial be continued to December 4. RP at 51-52. The trial court expressed annoyance with another request to continue. Mr. Steinmetz's associate stated his understanding that Mr. Steinmetz "is currently in negotiations with Ms. Bittle and those are ongoing." RP at 53. The prosecutor filling in for Ms. Bittle told the court that the State opposed a further continuance and "[t]he victim was very specific that she does not want another continuance." RP at 53. The prosecutor informed the court that the victim was enlisting in the military, which created additional cause for concern about any continuance.

The trial court was reminded that Mr. Steinmetz had taken over Mr. Jungers's defense after Ms. Penner left his firm, at which point Mr. Jungers tried to interject. The trial court allowed him to speak briefly, and Mr. Jungers said:

> MR. JUNGERS: I had a difficult time contacting Ms. Mount [Penner].
> THE COURT: Okay.
> MR. JUNGERS: She put me off on my visit to their officers [sic] to look at discovery and never renewed it. So, there was a lot of discovery that I never looked at. She made one appearance here, one appearance by telephone and one appearance by proxy, somebody else somewhere, some guy I've never seen before and one time there was nobody here at all and the prosecutor actually helped me. So, really I understand there were

6

continuances, but there wasn't anything being done to forward my defense. Now, thanks to emails on my part, we're getting some progress.

RP at 58-59.

The trial court declined at the August hearing to continue the trial date. It determined from Mr. Steinmetz's associate that Mr. Steinmetz could "probably" attend a continued omnibus hearing in two weeks and re-set the omnibus hearing for September 4. RP at 59.

Mr. Steinmetz appeared on September 4 and made his own request for a continuance due to an eight week murder trial scheduled to begin in about a week. Ms. Bittle objected again, noting the case had already been continued six times and the victim was trying to move forward with her life. The court informed Mr. Steinmetz that if it were to continue the date, there would likely not be any more continuances granted absent an emergency. The trial court then continued the omnibus hearing to November 6, with trial set for December 4.

An associate of Mr. Steinmetz's appeared at the November 6 hearing and reported that Mr. Steinmetz was still involved in the murder trial, which had run longer than expected. Ms. Bittle informed the court that "the victim in this matter has contacted not only our office, but also the law enforcement that's been working on this case and let them know that she'd like to have this case moving forward. It's been going on for a year." RP at 85. The trial court continued omnibus for a week, to November 13.

7

On November 11, Ms. Crest completed a confidential SSOSA evaluation of Mr.

Jungers, in which she expressed her opinion that "Mr. Jungers' is not an appropriate

candidate for the SSOSA sentencing option." Clerk's Papers (CP) at 170 (text prior to

revision). She reported the following conclusions:

> Mr. Jungers is a 76-year-old man who is admitting to having engaged in sexual contact several years ago against a then 7-9-year-old female child. He and his wife had befriended the child and her mother via the mother's relationship with their son. Mr. Jungers described an unusually close and emotionally distorted relationship with the child throughout several years. He described the child as "special, impossible to say no to". Although Mr. Jungers now admits that he did engage in sexual contact against the child and that he was aroused and used that arousal for his own sexual gratification, he continues to describe the child as the initiator of the sexual contact. At times, he portrays himself as a victim to his report of her overtures.
>
> Given his narrative that it was the child's sexual interest and curiosity that initiated and sustained the sexual contact, Mr. Jungers has expressed little or no understanding of the harm he perpetrated on this child. He is almost exclusively focused on portraying himself as having been co-opted by the child into the sexual contact. He certainly regrets his sexual contact against the child, but at this point his regret is primarily related to the consequences he is facing, as well as the consequences for his wife.

CP at 169-70 (text prior to revision). The report remained confidential for the time being.

On November 13, a Wenatchee lawyer who was acquainted with Mr. Steinmetz

appeared on his behalf and reported that Mr. Steinmetz was still "in the middle of a

murder trial" in King County. RP at 90. He said the murder trial was expected to go

several more weeks and requested a trial continuance to mid-January. A prosecutor

8

appearing for Ms. Bittle objected, telling the court that there had been eight prior

continuances.

Speaking of Mr. Steinmetz, the trial court said:

Well, if he's in trial he's not gonna be ready by December 2nd.  I mean he's just not.  I don't think there's any doubt about that.  On the flip side, I want to have him here present so we can talk to him and say hey, is this a case you're committed to or do you have other matters that you are committed to as well and just don't have the time to give to this case?  Because we can't continue—continue to continue it out if he's gonna be that busy that he cannot handle this case.

RP at 92.  After confirming that the Wenatchee lawyer could appear on November 25 if

Mr. Steinmetz could not, the court set a status hearing for November 25, and a CrR 3.5

hearing for November 27.  It did not continue the trial date.  It told the Wenatchee lawyer

that if Mr. Steinmetz was "done with trial, we want him here, physically here," otherwise

"we need some type of update from him to figure out . . . is he gonna be able to basically

give time to this case."  RP at 93.

Ms. Bittle and Mr. Steinmetz had completed an order on omnibus hearing, which

the lawyers delivered for filing during the November 13 hearing.  Reviewing it, the trial

court commented on its report that the State intended to amend the information.  The

prosecutor said that Ms. Bittle intended to add two special allegations.

On November 22, Ms. Crest revised her SSOSA evaluation and provided a new

confidential report.  This time, she expressed the opinion that "Mr. Jungers' is a

*minimally appropriate candidate* for the SSOSA sentencing option."  CP at 170 (as

9

revised) (emphasis added). She nonetheless recommended "that he be given the opportunity to participate in a community based SSOSA treatment program" and "be scheduled for treatment progress review hearings at 3-month intervals to ensure that he is moving forward in his accountability for his actions and his understanding of the harm he perpetrated on the victim." CP at 170 (as revised). The revised report still remained confidential.

Mr. Steinmetz personally appeared on November 25 hearing and asked the trial court to continue trial to January 23. He informed the trial court he had another "hard set" trial that could not be changed. RP at 101. He said he had proposed to Ms. Bittle "that I would be in touch with her over the Christmas holidays. She'll have some availability and will be a little easier for us to communicate back and forth and see if we can come to a resolution. I think we're at a point where we can discuss a productive resolution of this." *Id.* The State again objected to the continuance, but asked that any continued dates be "hard set;" Mr. Steinmetz assured the court that "if there is no movement on resolution, I will be ready to go." RP at 102-03. The trial court continued the trial date to January 23, 2020, the CrR 3.5 hearing to January 15, and the readiness hearing to January 21.

*2020 proceedings*

At the time set for the CrR 3.5 hearing on January 15, Mr. Jungers stipulated to the admissibility of his statements. A lawyer from Ephrata stood in for Mr. Steinmetz, explaining that Mr. Steinmetz was "concerned about snowmageddon coming over the mountains." RP at 108. The stand-in lawyer said he had discussed the stipulation with Mr. Jungers, who understood its contents, and Mr. Jungers affirmed to the court that he had signed and understood "everything . . . that is concerned with this." RP at 109. When the trial court told those present that it would see them at the readiness hearing on January 21, Ms. Bittle mentioned that she believed, based on her conversations with the defense attorney, that Mr. Jungers would be changing his plea on the 21st.

Instead, on the following day, January 16, Mr. Steinmetz filed a motion for an order authorizing him to withdraw as counsel. In his affidavit in support of the motion, Mr. Steinmetz informed the court that "[o]n January 15th, 2020, the Defendant informed me he has chosen to dismiss me as counsel in this matter," and, "Given the restraints of attorney-client privilege, it would be improper for me to reveal the reasons for his so requesting to the Court." CP at 29. It continued, "The Defendant advised he would be hiring Lylianne Couture of the Couture Law Firm," and that Mr. Steinmetz had contacted Ms. Couture, who "advised that the Defendant had contacted her about representation." CP at 30.

11

Ms. Bittle filed a 6-page objection and declaration. After recounting the history of continuances, she informed the court that she and Mr. Steinmetz had discussed a proposed resolution on December 23; on January 9, she was notified by Mr. Steinmetz that Mr. Jungers had signed off on the proposed resolution; the victim had agreed to the proposed resolution; on January 10, Mr. Steinmetz corresponded with her about language for Mr. Jungers' statement on plea of guilty; and on January 15, Mr. Jungers stipulated to the admissibility of his statements, as expected. She testified that "[o]n the afternoon of January 15," however, she received a telephone call from Ms. Couture, who "advised that the defendant was in her office and wanted to know the status of the case." CP 39. She testified, "I advised that it was the State's belief that the parties had reach[ed] a resolution but that trial was set for the following Wednesday." CP at 39. Ms. Bittle testified that on January 16, she received an e-mail from Ms. Couture stating that she expected to be "formally" retained on January 22 and would ask that the trial be continued to April. Ms. Bittle responded to Ms. Couture that the court had ruled in November that there would be no more continuances and the State would be asking that trial proceed as scheduled.

Ms. Couture's motion for an order allowing her to be substituted as counsel was heard on January 27. Mr. Steinmetz was present. The trial court commented that in the parties' last appearance, it was led to believe the case was resolved and that Mr. Jungers would enter a plea. It asked what happened. Given the issues on appeal, we quote at length from comments made at the hearing.

12

Mr. Steinmetz explained that when he and Mr. Jungers had discussed early in his representation how to proceed and had some disagreements,

> the conversation shifted towards how could we resolve this case so he would not end up in prison and that's been what I've been trying to accomplish since I've been into the case you know a little less than six months. And without—without revealing any confidences, I believe at this point, Mr. Jungers has no faith in my ability to proceed with this case. He does not listen. He is not interested in what I have to say about the case. There's been a complete breakdown of communications as far as any kind of trust or understanding, the ability to work together and he wants another attorney and that's fine. I would not stand in his way. It's my understanding he's hired a very competent attorney to represent him and wants to proceed to trial.

RP at 124.

The trial court observed that it did not sound like Mr. Steinmetz had done anything wrong; rather, Mr. Jungers just decided he did not want to follow Mr. Steinmetz's recommendation. He asked if *Mr. Steinmetz* believed he did something wrong, and Mr. Steinmetz answered:

> I don't believe I did anything wrong. The biggest issue, I suppose in my representation, is that I proceeded as if this case was going to resolve and as a consequence, we have a trial date on Wednesday and I'm not prepared to proceed at that point.

RP at 125.

The trial court expressed frustration that Mr. Steinmetz was not ready to proceed to trial. It questioned Mr. Steinmetz, Ms. Couture and Ms. Bittle about the number of expected witnesses and when their interviews could be arranged. It

13

determined that there were four known potential witnesses and "then there is [the] possibility of another witness or two that might come out because of who is interviewed." RP at 129. Ms. Bittle projected that the State could make the witnesses available for interview within a week.

The trial court expressed resignation that a continuance was required, since the failure to interview witnesses could lead to reversal of any verdict on the basis of ineffective assistance of counsel. It continued:

> The question I have is why three months though? I know your schedule, Ms. Couture, doesn't allow you because you say you have these other matters that you're dealing with. But I don't see this as being a three month continuance quite frankly and so the question is if I give you one or two weeks, are you gonna be prepared for trial? If not, Mr. Steinmetz, who I don't have any reason to believe he's not capable of proceeding, this is his case still and so I expect he's gonna get these witness interviews done and go forward.
>
> MS. COUTURE: Your Honor, I don't think I could be ready in two weeks. I would have to practically clear my whole schedule to get that accomplished.
>
> THE COURT: So then I don't think you have the ability to substitute in as counsel at this point if you're not gonna be able to be prepared to go forward. Because again, and it's not through your fault, I know you're coming in late but this is a year and a half old case. And your client knew Mr. Steinmetz was in this case since at least June. He put an appearance in. They've had discussions. They've talked. I was here two months ago and he was here as well and we said hey, there's no more continuances. This case is either gonna go forward or it's gonna get resolved. And I don't hear anything by way of some type of major complaint, unless somebody can point it out, that says Mr. Steinmetz for whatever reason is not capable, he's been incompetent in some form or fashion. It sounded like it was gonna be resolved and for whatever reason it was not. And so again, I'm not hearing anything by way of Mr.

14

Steinmetz is not capable of handling this case or that he's done something that's extremely prejudicial that's caused somehow, Mr. Jungers some type of prejudice at this point.

. . . .

So basically, I'm gonna grant a continuance, but it's only gonna be two weeks. In two weeks those interviews should be done. Obviously, if there's some other major issue that comes up, we will deal with it at that point in time.

Ms. Couture, I'm happy to enter you as substitution—substituted counsel, but only under the condition that you're aware this is going to trial in two weeks and it's not gonna be put aside for your other matters that you may have.

RP at 130-32.

After Ms. Couture declined substitution on that basis, Mr. Steinmetz asked the court what it recommended to improve communications with Mr. Jungers,

because at this point, as I said, we have a break—a complete breakdown. He's not communicating with me about anything substantive and he doesn't want to hear what I have to say.

THE COURT: I don't know if I have an answer for that off the top of my head. All I can say is from the record, it looks like there was good communication up until the 15th of this month and—

MR. STEINMETZ: I would not characterize it as good.

THE COURT: Okay. Well, it sounded like there was a discussion. Again, we can go back over the history. The 15th 3.5 statement was stipulated to, presumably under your advice. So, I presume that you advised Mr. Jungers of this and I asked him in court, is this your signature, did you go over this with your attorney? I heard no complaints. I heard nothing about hey, my attorney is not informing me of any issues. I asked him, are you sure, this your signature, you went forward? Yes. And then I heard from [stand-in counsel] saying hey, this is gonna be resolved in the next hearing dates. And again, I presumed that representation came from you telling [stand-in counsel] yep, I've talked to Mr. Jungers, you know, we discussed whatever issues there are and Mr. Jungers didn't say at the 3.5

15

hearing when he heard [stand-in counsel] say that I don't remember Mr. Jungers saying hey, wait a minute, I'm not aware of any of this or what's happening with the case. So, it sounds like there was decent communication, if not good communication, up through the 15th of this month. Between the 15th and the 16th you get a phone call that simply says hey, I want to ask Ms. Couture now to represent me. I'm not sure where the breakdown in communication occurred at that point other than, again, the only thing—from the outside looking in right now, it sounds like it was resolved and for whatever reason decided I don't want to resolve it. So, I'm not sure again, where that statement, it's not the best communication, is coming from.

MR. STEINMETZ: Well and Your Honor, I really can't reveal that without revealing confidences. So, you've put me in an awkward position. But I can represent to the Court in good faith that we've had a breakdown of communication and it has been difficult throughout my pendency in this case and I think Mr. Jungers would agree with that.

MR. JUNGERS: Absolutely.

THE COURT: So, sir, I can tell you this. I'm happy to assign a new attorney for you if you want, but you've got to find somebody who is ready to go to trial because I have not hear[d] anything that tells me Mr. Steinmetz is somehow incapable or not able to take this case to trial on your behalf.

RP at 133-35. The trial court concluded its oral ruling by explaining why it believed the factors relevant to permitting substitute counsel identified in *State v. Hampton*, 184 Wn.2d 656, 662, 361 P.3d 734 (2015), supported its decision. It scheduled the readiness hearing for February 10 and the trial for February 12.

Instead, a change of plea hearing was held on February 3. Mr. Steinmetz was present as Mr. Jungers's counsel. The State informed the court that after the January 27 hearing, it worked quickly with Mr. Steinmetz to schedule witness interviews, it informed him it would be moving to amend the charges with additional enhancements, and Mr.

16

Steinmetz had asked the State if it remained willing to agree to the earlier-negotiated plea, which it was. Mr. Jungers agreed to plead guilty to three counts of child molestation in the first degree and the State agreed to dismiss the indecent liberties charge. Mr. Jungers intended to ask for a SSOSA and the State would request standard range sentencing.

At the hearing at which Mr. Jungers entered his guilty plea, the trial court questioned Mr. Jungers directly and extensively in order to determine the knowing and voluntary nature of the plea. Mr. Jungers affirmed his understanding of rights he was giving up and stated in his own words what he did to make him guilty of the crimes he pled guilty to. The trial court accepted the plea.

In a March 21 presentence investigation (PSI) report, the Department of Corrections (DOC) recommended against a SSOSA because Mr. Jungers "showed no remorse for his actions, nor did he take responsibility for his actions." CP at 99. It quoted Ms. Crest as opining that Mr. Jungers "is not an appropriate candidate for the SSOSA sentencing option," and agreed with her. CP at 90.

In a supplemental PSI report, DOC community corrections officer Mariah Fernandez reported to the court that after seeing her report, Mr. Steinmetz contacted her and questioned where she obtained a copy of Ms. Crest's original November 11 report. Apparently he had not intended DOC to receive it. Mr. Steinmetz provided Ms. Fernandez with Ms. Crest's revised November 22 report. In the supplemental PSI, Ms.

Fernandez reported respects in which she believed Mr. Jungers had not been forthcoming

with DOC.  She stated that Ms. Crest's revised opinion did not change DOC's

recommendation against a SSOSA.

A sentencing hearing was held on April 9.  Both the State and Mr. Jungers filed

extensive sentencing memoranda.  H.N. and her mother filed victim impact statements.

DOC had forwarded a victim impact statement from a second young woman, B.V., who,

as a child, had been present during incidents taking place between H.N. and Mr. Jungers.

The State agreed that Mr. Jungers met the statutory criteria for a SSOSA but disagreed

that it was an appropriate sentence and asked the court to sentence him to a term of 130

months to life in prison.

H.N. read her victim impact statements to the court.  In it, she said, "I spent ten

years in my own little mental prison and I think he should get his."  RP (Sentencing) at

51.  H.N.'s mother read her own victim witness statement, in which she said, "I just want

my daughter to feel safe.  I want her to be able to go about town and not have that edging

fear of possibly seeing him . . . .  The only way I can feel this can happen is if he can get

[the] maximum sentence."  RP (Sentencing) at 43.

Mr. Steinmetz argued for a suspended sentence of 98 months upon successful

completion of a SSOSA.  In addition to arguing why Mr. Jungers qualified for the

sentencing alternative, Mr. Steinmetz reviewed the number of physical ailments suffered

18

by his 77-year-old client and emphasized that Mr. Jungers was extremely at risk of the COVID-19 virus.

In announcing its sentencing decision, the trial court addressed each matter courts are directed by RCW 9.94A.670(4) to consider in determining whether to order the sentencing alternative. When it reached the "victim's opinion" consideration, it observed that H.N.'s and her mother's statements to the court were "powerful, very telling and informative." RP (Sentencing) at 87. It noted that by statute, it was to give "great weight" to the victims' opinions. Addressing victims' interests in general and H.N.'s interests in particular, it said:

> [THE COURT:] . . . I've been a judge for over 20 years, but in these kinds of cases, especially the sexual offense cases, I've come to conclude that sometimes my sentencing means more to victims and their healing than I thought. So that it's not just representative of justice. Because sometimes I'll tell people, look, regardless of what my sentencing, it doesn't equate to what you've lost. And we all know that.
>
> Taking that notion aside for a minute, sometimes what the court does can bring healing to victims. And I never knew that until a couple years ago. And that's a finding I have in this case, is that this will help her heal and get on with her life. And the reason I say that in this case, there were some specific things that I said that I read that to me were very telling. So where the mother says—and I believe this—where she says, "I just want my daughter to feel safe. I want her to be able to go about town and not have that edging fear of possibly seeing him. I want her to feel like she can breathe and finally live her life. The only way I feel this can happen is if he serves the maximum sentence."
>
> That's what the statute is addressing, I believe . . . .
>
> . . . .

> And so I know we could try to craft an order that says, don't have any contact with [H.N]. We may or may not be able to do banishment orders, those are usually unconstitutional, like don't go into a certain town. It still might be stipulated to. But I don't think she'd feel safe. I really don't. And so that's a large factor for me to consider here today.
>
> As I said, that's something that I've learned, that sometimes it makes a difference in people's lives just what the court sentences.

RP (Sentencing) at 88-90. Mr. Steinmetz did not object to the trial court's discussion of victims' interests or its observation that it was directed by statute to give the victim's opinion great weight.

After reviewing the five policy rationales for sentencing, the trial court announced it would not grant the request for a SSOSA. It imposed concurrent indeterminate sentences of 114 months to life. Mr. Jungers appeals.

## ANALYSIS

It is well settled that a plea of guilty forecloses appeal except as to collateral questions such as the validity of the statute violated, the sufficiency of the information, the jurisdiction of the court, or the circumstances surrounding the plea. *State v. Saylors*, 70 Wn.2d 7, 9, 422 P.2d 477 (1966)). Mr. Jungers makes six assignments of error that we analyze as raising four collateral questions.

I.  MR. JUNGERS DOES NOT DEMONSTRATE THAT DENIAL OF HIS REQUEST FOR A CONTINUANCE AND SUBSTITUTION VIOLATED DUE PROCESS

We first review Mr. Jungers's challenge to the trial court's refusal to continue trial and substitute Ms. Couture as his lawyer through the lens of his desire to proceed to trial

with his counsel of choice. Review of the challenge through the lens of his claim of constructive denial of counsel is reviewed in section II. Well-settled case law governs this review of the trial court's decision.

Under the Sixth Amendment to the United States Constitution, defendants able to retain a private attorney generally have the right to the counsel of their choice. *Hampton*, 184 Wn.2d at 662. The right to counsel of choice is not absolute, however, and one limit on the right is "a trial court's wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). When a criminal case has been set for trial, court rules provide that "no lawyer shall be allowed to withdraw from said cause, except upon written consent of the court, for good and sufficient reason shown." CrR 3.1(e).

When a defendant desires new counsel but requires a continuance to do so, we review a trial court's denial of a continuance to determine "whether it was 'so arbitrary as to violate due process.'" *Hampton*, 184 Wn.2d at 663 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964)). In *Hampton*, our Supreme Court held that the trial court's task in such cases is to "'weigh the defendant's right to choose his counsel against the public's interest in the prompt and efficient administration of justice,'" and when engaging in this "highly fact dependent" process it can consider "all relevant information." *Id.* at 669 (quoting *State v. Aguirre*, 168 Wn.2d 350, 365, 229

21

P.3d 669 (2010)).  It explicitly blessed courts' consideration of 11 factors described in

3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.4(c) at 822-25 (4th ed. 2015).

It observed that "[n]ot all factors will be present in all cases, and thus a trial court need

not evaluate every factor in every case."  *Hampton*, 184 Wn.2d at 670.  We review a trial

court's decision for abuse of discretion.  *Id*.

In deciding to grant Mr. Jungers a two-week continuance but not a three-month

continuance, the trial court analyzed 10 of the 11 *Hampton* factors, as follows:

*Factor 1: Whether the request came at a point sufficiently in advance of trial to permit the trial court to readily adjust its calendar*

Based on the facts that the information was filed in October 2018 and, following a

number of continuances, the trial court set a hard date that all the parties should have

been ready for, the court found that the request did not come at a point sufficiently in

advance of trial to permit the trial court to readily adjust its calendar.

*Factor 2: The length of the continuance requested*

The trial court observed that a three-month continuance to interview five or six

witnesses "seems a little extraordinary."  RP at 136.  As such, the trial court determined

the length of the continuance "doesn't seem to match what is being done here."  *Id.*

*Factor 3: Whether the continuance would carry the trial date beyond the period specified in the state speedy trial act*

Because the parties were 15 months into the case, the trial court observed,

"[W]e're definitely past what the normal speedy trial is."  RP at 137.

22

*Factor 4: Whether the court had granted previous continuances at the defendant's request*

The trial court found it had granted at least three or four continuances (the State's view was that the number was considerably higher). The court noted that when it granted the last continuance, it told the parties they must be ready to go by the next trial date.

*Factor 5: Whether the continuance would seriously inconvenience the witnesses*

The trial court found the main witness, the alleged victim, had been trying to get into the military and had been putting it off because of the trial. The trial court found this to be a serious inconvenience to the main witness.

*Factor 6: Whether the continuance request was made promptly after the defendant first became aware of the grounds advanced for discharging his or her counsel*

The trial court first observed that it was not sure if the request was made promptly or not. It had not perceived any breakdown in communication between Mr. Jungers and Mr. Steinmetz. Instead, the trial court found that "it sounds like there was a recommendation made and eventually somebody said I don't agree with the recommendation. It doesn't sound like there was a defect or deficiency in representation." RP at 137-38.

*Factor 7: Whether the defendant's own negligence placed him or her in a situation where he or she needed a continuance to obtain new counsel*

While the trial court did not characterize Mr. Jungers as negligent, it observed that Mr. Steinmetz had been on the case for six or seven months before the court was made

aware of an issue with communication. The court also determined that whoever was at fault for the late request for a continuance, "[I]t's not the Court's fault and certainly not the State's fault at this point or the complaining witness's fault." RP at 138.

Mr. Jungers argues that he made the trial court aware of his issues with counsel at the August 20 hearing, but in context, Mr. Jungers's complaints at that time were directed at Ms. Penner (who he referred to as Ms. Mount), not Mr. Steinmetz. Mr. Jungers informed the court at the August 20 hearing that he was "getting some progress" at that point. RP at 59. If there *was* an earlier, serious breakdown of communication between Mr. Steinmetz and Mr. Jungers, the trial court was not made aware of it until the motion to substitute counsel.

> *Factor 9: Whether there was a rational basis for believing that the defendant was seeking to change counsel primarily for the purpose of delay*

The trial court stated that looking at the timing of the request "from the outside" and based on "what had happened immediately prior to" the request, there was "some indication" that Mr. Jungers was seeking to delay rather than go forward with the recommended plea. RP at 138. It admitted that it did not know that, exactly.

> *Factor 10: Whether current counsel was prepared to go to trial*

The trial court observed that Mr. Steinmetz was not able to go to trial on the originally-scheduled date but he could be prepared "shortly." RP at 138.

24

*Factor 11: Whether denial of the motion was likely to result in identifiable prejudice to the defendant's case of a material or substantial nature*

The trial court observed that in light of its willingness to grant a two-week continuance, Ms. Couture had not been able to identify "prejudice to the defendant's case" of a material or substantial nature. RP at 139. She had identified the need to conduct witness interviews, but the court's questioning revealed that it was feasible to complete the witness interviews in less than two weeks, and Mr. Jungers had not demonstrated otherwise.

The *Hampton* factor that the trial court did not address, and which is the major focus of Mr. Jungers's argument on appeal, is factor 8, "[w]hether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation." *Hampton*, 184 Wn.2d at 670. If Mr. Jungers could demonstrate a complete breakdown in communication or irreconcilable conflict with Mr. Steinmetz, that would be a sufficient and independent constitutional error, as discussed in section II, below. But as discussed further below, the trial court reasonably found that Mr. Jungers had not shown any sign of dissatisfaction with Mr. Steinmetz until he changed his mind about accepting Mr. Steinmetz's recommendation that he plead guilty.

The trial court's findings on the *Hampton* factors support its decision not to continue trial for three months. Its findings are supported by the history of proceedings

25

in the case, the information provided by Ms. Bittle, Mr. Steinmetz and Mr. Jungers, and

reasonable inferences from that information. No abuse of discretion is shown.

II.    MR. JUNGERS DOES NOT DEMONSTRATE THAT DENIAL OF HIS REQUEST
       CONSTRUCTIVELY DENIED HIM REPRESENTATION BY COUNSEL

We next review Mr. Jungers's contention that the trial court's refusal to continue

trial given what he contends was a "complete breakdown" in communication and

"irreconcilable conflict" with Mr. Steinmetz constructively denied him representation by

counsel in plea negotiations. Am. Opening Br. of Appellant at 16, 32. As observed in

*United States v. Velazquez*, 855 F.3d 1021, 1034 (9th Cir. 2017), the Sixth Amendment's

guarantee of effective assistance of counsel applies at the plea-bargaining stage, so

constructive denial of counsel can occur at that phase just as it can at trial. *See accord In

re Pers. Restraint of Stenson*, 142 Wn.2d 710, 722, 16 P.3d 1 (2001) ("If the relationship

between lawyer and client completely collapses, the refusal to substitute new counsel

violates the defendant's Sixth Amendment right to effective assistance of counsel."). It is

in connection with this challenge that Mr. Jungers argues that the trial court should have

conducted an *in camera* hearing.

Mr. Jungers twice emphasizes that this is a narrow, record-based claim of *denial

of counsel*, not any other claim of ineffective assistance of counsel. He emphasizes that

distinct matters such as Ms. Penner's and Mr. Steinmetz's alleged lack of diligence is

likely to be the basis of a nonrecord-based claim of ineffective assistance of counsel, to

26

be raised in a personal restraint petition (PRP).  Am. Opening Br. of Appellant at 25 n.7, 29 n.11.  It is prudent for appellate counsel to forego challenges on direct appeal that cannot be demonstrated in the appellate record.  Nonrecord evidence can be presented in a PRP, but a PRP may not raise an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of the issue.  *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 750, 101 P.3d 1 (2004).  We respect the distinction that counsel is drawing.  We analyze this challenge as depending on a complete breakdown of communication and irreconcilable conflict that is allegedly demonstrated in the record.

To determine whether an irreconcilable conflict requires substitution of counsel, the Washington Supreme Court has adopted a three-factor test identified by the Ninth Circuit Court of Appeals.  *Stenson*, 142 Wn.2d at 723-24 (citing *United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998)).  The factors are "(1) the extent of the conflict; (2) the adequacy of the inquiry; and (3) the timeliness of the motion."  *Moore*, 159 F.3d at 1158-59.  As *Moore* explains, the same test is applied in evaluating whether an irreconcilable conflict exists and whether the trial court erred in failing to substitute counsel.  *Id.* at 1158.  The "adequacy of the inquiry" factor is concerned with whether the inquiry created a "sufficient basis for reaching an informed decision."  *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986).  While a formal, in-depth, private investigation into the specific details of the dispute is favored, a formal investigation is

not required if the judge's own observations and the defendant's description of the issue provide a sufficient basis for reaching an informed decision. *Id.*

Federal appeals courts have held that a trial court fails to make an adequate inquiry when it does not inquire into how long a continuance would be needed for new counsel, makes no attempt to gauge the inconvenience caused by such a delay, does not question the attorney or defendant about the degree to which their animosity prevented adequate preparation, and does not ask why the motion had not been made earlier. *Moore*, 159 F.3d at 1161; *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir. 1995), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999); *United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001).

Here, the trial court did inquire into the continuance that would be needed for new counsel. Ms. Couture never budged from her stated need for a three month continuance, and Mr. Steinmetz's estimate, which was credible based on what the trial court heard from him and the prosecutor, was that he could be ready in two weeks. The trial court was cognizant of the inconvenience that would be caused by delay—most significantly, the interference in the life of H.N., who had graduated from high school the year before and was pressing the prosecution and law enforcement about when she could get on with her life. The trial court's questions sought an explanation of when the issue arose that resulted in the motion.

The trial court's inquiry into the nature of the conflict between Mr. Jungers and Mr. Steinmetz was narrower than in cases relied on by Mr. Jungers, but it was reasonably narrower. It was a material circumstance that Mr. Jungers could afford retained counsel and was demonstrably able to hire and replace his lawyers quickly.[3] From that, it was reasonable to infer that Mr. Jungers would have replaced Mr. Steinmetz earlier if he was dissatisfied with his representation.

As the trial court observed, Mr. Jungers consistently attended hearings. Mr. Jungers was present when Mr. Steinmetz's associates or local counsel stood in for him. Mr. Jungers was present when the trial court and counsel discussed the fact that Mr. Steinmetz had not yet interviewed the handful of witnesses expected to be called at trial. Mr. Jungers did not make any complaints about Mr. Steinmetz before the motion to substitute counsel. Asked on January 15, 2020, if he understood the stipulation to admissibility of his statements that was presumably recommended by Mr. Steinmetz, Mr. Jungers told the court, "I understand everything that—that is concerned with this." RP at 109.

---

[3] By the time of Mr. Jungers's first appearance, which took place the day after his arrest and within two days of his intercepted phone call from H.N., he had retained counsel from a King County criminal defense firm. On January 15, 2020, Mr. Jungers appeared at 11:00 a.m, in the morning with Mr. Steinmetz's associate to stipulate to the admissibility of his statements, and managed to schedule a meeting with Ms. Couture to discuss *her* engagement that afternoon. *See* CP at 39.

Knowing that Mr. Jungers could have discharged Mr. Steinmetz at any time, and knowing from Ms. Bittle's opposition that she and Mr. Steinmetz believed Mr. Jungers had agreed to a plead guilty, it makes sense that the question in the trial court's mind was narrow: "So, between January 15 and the following Monday, what happened?" RP at 123. He asked that question, and Mr. Steinmetz and Mr. Jungers provided him with the same answer. Mr. Steinmetz said the trial court correctly surmised that Mr. Jungers led him to believe that he was willing to take the plea that Mr. Steinmetz had negotiated with Ms. Bittle. But then Mr. Jungers changed his mind. Mr. Jungers agreed, telling the trial court in his own words that Mr. Steinmetz had been unable to provide Mr. Jungers with a document that would "explain to me precisely what it is that I am alleged to have done," and "I can't plead guilty to something that I don't know what it is I'm supposed to have done." RP at 140-41.

We do not see how it would have been helpful for the trial court to ask Mr. Steinmetz *why* he recommended that Mr. Jungers plead guilty, or how he explained that recommendation to his client. The trial court was aware of the police reports. It knew the intercepted telephone call would be admitted at trial. One can surmise why defense counsel would recommend a plea. It might have been prudent for the trial court to question Mr. Jungers even more closely about why he decided to consult a second lawyer, if for no other reason than to avoid an issue like this on appeal. The trial court

30

could draw on its experience, however.  As the Supreme Court of Michigan observed

decades ago:

> Reluctance on the part of many defendants to face the reality on trial day
> morning that the moment of truth is at hand is a familiar fact of life in the
> criminal justice system.  Experienced trial judges, such as the able judge in
> this case, are thoroughly familiar and regularly confronted with trial day
> adjournment requests, advanced for countless reasons and frequently
> coupled with parallel and conditional requests to discharge counsel and
> proceed [p]ro se.

*People v. Anderson*, 398 Mich. 361, 247 N.W.2d 857 (1976).  Importantly, given an

opportunity to explain any respect in which he was unable to communicate with Mr.

Steinmetz, Mr. Jungers identified none.  *See* RP at 139-41.

Mr. Jungers argues that the trial court's failure to question Mr. Steinmetz and Mr.

Jungers *in camera* was error that allowed the State to obtain privileged information that it

used to coerce Mr. Jungers into signing the plea agreement.  There is no requirement that

a trial court conduct a private, in camera hearing when presented with a motion to

substitute counsel.  *McClendon*, 782 F.2d at 789 (no abuse of discretion when trial court

questioned the defendant and counsel on the record).

The contention that argument in the presence of Ms. Bittle gave her new leverage

is unpersuasive.  Nothing of import revealed at the January 27 hearing was new to the

prosecution.  The extent of Mr. Steinmetz's preparation and lack thereof was discussed at

many prior hearings.  Ms. Bittle knew that Mr. Steinmetz had not arranged witness

interviews.  She knew that Mr. Steinmetz had been focused on negotiating a plea

agreement.  Ms. Couture informed Ms. Bittle in a e-mail on January 16 that she had just

been retained and would need a three month continuance.  Mr. Jungers is not assigning

error on appeal to the failure of *Mr. Steinmetz and Ms. Couture* to request argument

outside the presence of the prosecutor.  He does not demonstrate anything revealed

during the course of the hearing that should have caused the trial court, sua sponte, to

order that the argument move *in camera.*

A week after the motion for substitution was denied, Mr. Jungers reconsidered and

entered the originally-agreed plea.  The trial court was understandably very thorough in

questioning Mr. Jungers about its voluntariness.  *See* RP at 149-57.  Mr. Jungers gave

clear, direct answers that affirmed the knowing and voluntary nature of his plea.  *See id.*

We have no reason to disregard his clear answers to the trial court's questions in favor of

his self-serving argument on appeal that his actions were not voluntary.  Mr. Jungers's

entry of unambiguous guilty pleas knowing that he was otherwise about a week away

from trial is strong evidence that his request for substitution of counsel was the result of

reluctance to face the moment of truth and a desire to delay.

III.    PARTICULARLY GIVEN THE POLICY REASONS FOR THE EXISTENCE OF THE SSOSA,
        THERE IS NOTHING UNCONSTITUTIONAL ABOUT GIVING "GREAT WEIGHT" TO THE
        OPINION OF A VICTIM

Mr. Jungers next argues that the statutory directive of RCW 9.94A.670(4) to give

great weight to the victim's opinion violates separation of powers.  He also argues that

when the trial court gave great weight to H.N.'s opinion he was subjected to cruel and

unusual punishment. The State responds that while Mr. Jungers's challenges are

constitutional in nature, he cannot demonstrate the "manifest" constitutional error that

would cause us to review an error that was not preserved in the trial court. We agree with

the State but exercise our discretion to address the challenges. *See* RAP 2.5(a) ("The

appellate court *may* refuse to review any claim of error which was not raised in the trial

court." (Emphasis added.)).

> *Nature and history of the sentencing alternative*

The nature and history of the sentencing alternative has relevance to our

constitutional analysis. RCW 9.94A.670 sets out general criteria for who is eligible for a

SSOSA, such as lack of prior history of sex crimes, an established relationship with the

victim, and a standard range exceeding 11 years. *See generally* RCW 9.94.670(2). Once

the offender satisfies the initial criteria, the court must then weigh factors identified in

RCW 9.94.670(4).

"The state legislature enacted SSOSA in 1984 to permit trial courts to suspend the

sentences for first time offenders in exchange for treatment and supervision." *State v.

Pratt*, 196 Wn.2d 849, 855, 479 P.3d 680 (2021) (citing SUBSTITUTE H.B. 1247, 48th

Leg., Reg. Sess. (Wash. 1984)). "The legislature developed the sentencing alternative

with recommendations from the Sentencing Guidelines Commission, which in turn relied

on input from treatment professionals and victim advocates." *Id.* The commission

reported to the legislature that treating offenders was a 'major concern' for victims and

their families because in many cases

> "sex offenders commit their crimes against children related to them by blood or marriage. Family friends are also common offenders in these type of crimes. Given these relationships, *many victims and their families want to see the offender receive help rather than a prison sentence.*"

*Id.* at 856 (emphasis added) (quoting SENTENCING GUIDELINES COMM'N, REPORT TO THE

LEGISLATURE at 2 (Feb. 1984)). "The commission also noted that '[w]ithout the

cooperation of victims, the criminal justice system is ineffective in responding to sexual

abuse; *the effect of a sentencing policy on victims' attitudes toward reporting is therefore*

*critical*.'" *Id.* (emphasis added) (alteration in original) (quoting SENTENCING

GUIDELINES COMM'N, REPORT TO THE LEGISLATURE at 2-3 (Feb. 1984)).

"During the 2004 session, the legislature amended the SSOSA in order to 'further

increase the protection of children from victimization by sex offenders.'" *Id.* (quoting

ENGROSSED SUBSTITUTE H.B. 2400, at 2, 58th Leg., Reg. Sess. (Wash. 2004)).

"Testimony from the legislative hearings emphasized that '[t]he majority of sex crimes

against children are committed by people who have a relationship with the child' or occur

in 'the family context.'" *Id.* (alteration in original) (quoting H.B. REP. ON ENGROSSED

SUBSTITUTE H.B. 2400, at 10, 5, 58th Leg., Reg. Sess. (Wash. 2004)). "These

relationships between offender and victim make it less likely that abuse would be

reported by victims or caregivers as '[f]amily members are often reluctant to report sex

34

offenses if they feel the perpetrator will get a lengthy prison sentence.'" *Id.* (quoting

H.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2400, at 8, 58th Leg., Reg. Sess. (Wash.

2004)).

"Aside from adding RCW 9.94A.670(2)(e)'s requirement for an 'established

relationship' or 'connection' between an offender and victim, the 2004 legislature also

added additional SSOSA amendments to acknowledge that SSOSA victims, because of

their relationships with their abusers, would have an investment in the offender's

sentencing and treatment." *Id.* at 857. "The legislature provided multiple opportunities

for victims to address the court." *Id.* (citing RCW 9.94A.670(4), (8)(b), (9)).

As explained by the Washington Supreme Court, "[t]he legislature intended

SSOSA's purpose to be a narrow tool in circumstances where a victim would be reluctant

to report abuse and unwilling to participate in prosecution *without the promise of a*

*shortened sentence and treatment for an offender.*" *Id.* at 857-58 (emphasis added).

"The ongoing involvement of a victim in his or her abuser's supervision and treatment

makes sense only where the legislature believed a victim would be personally invested in

their abuser's confinement and rehabilitation." *Id.*; *Johnson v. Morris*, 87 Wn.2d 922,

927, 557 P.2d 1299 (1976) ("It is a fundamental rule of statutory construction that once a

statute has been construed by the highest court of the state, that construction operates as if

it were originally written into it.").

35

The legislative intent and policy are clear—the SSOSA was enacted to incentivize victims to report abuse when they would otherwise be deterred from reporting by the prospect of the abuser receiving a standard sentence. If a victim *wants* their abuser to receive a standard sentence, allowing the abuser to benefit from a SSOSA would be contrary to the legislature's intent and policy.

*Separation of powers doctrine*

The doctrine of separation of powers "'preserves the constitutional division between the three branches of government'" and ensures that the activities of one branch do not "'threaten or invade the prerogatives of another.'" *In re Estate of Hambleton*, 181 Wn.2d 802, 817, 335 P.3d 398 (2014) (quoting *State v. Elmore*, 154 Wn. App. 885, 905, 228 P.3d 760 (2010)). "The legislature violates separation of powers principles when it infringes on a judicial function." *Id.* A statute is presumed constitutional, *State v. Maciolek*, 101 Wn.2d 259, 263, 676 P.2d 996 (1984), and if the legislative enactment is reasonably capable of a constitutional construction, it must be given that construction. City of *Seattle v. Drew*, 70 Wn.2d 405, 408, 423 P.2d 522 (1967).

In Washington, it is well established that the authority to determine the sentencing process lies with the legislature. *State v. Thorne*, 129 Wn.2d 736, 767, 921 P.2d 514 (1996) ("[T]he determination of penalties for crimes is a legislative function."); *State v. Ammons*, 105 Wn.2d 175, 181, 713 P.2d 719, 718 P.2d 796, *cert. denied*, 479 U.S. 930,

107 S. Ct. 398, 93 L. Ed. 2d 351 (1986) (holding that whatever discretion a trial court has in sentencing is discretion that is granted by the legislature).

Contrary to Mr. Jungers's assertions, the intent of the legislature in enacting the SSOSA was not to save State financial resources or to favor treatment over confinement. As explained above, "[t]he legislature intended SSOSA's purpose to be a narrow tool in circumstances where a victim would be reluctant to report abuse and unwilling to participate in prosecution without the promise of a shortened sentence and treatment for an offender." *Pratt*, 196 Wn.2d at 857-58. Requiring the sentencing court to place "great weight" on the victim's statement conforms to the legislature's policy and intent and falls within its realm of deciding what discretion to grant to sentencing courts. Accordingly, it does not violate separation of powers.

*Constitutional protections against cruel or cruel and unusual punishment*

The Eighth Amendment to the federal constitution prohibits the infliction of "cruel and unusual punishment." Article I, section 14, of the Washington Constitution bars cruel punishment. *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014). The state constitutional provision is more protective than the Eighth Amendment in this context. *Id.* (citing *State v. Rivers*, 129 Wn.2d 697, 712, 921 P.2d 495 (1996); *State v. Fain*, 94 Wn.2d 387, 392, 617 P.2d 720 (1980)).

Our Supreme Court has identified four factors applied in determining whether a punishment is "cruel" within the meaning of article I, section 14, of the Washington

37

Constitution: "(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction." *Rivers*, 129 Wn.2d at 713.

As acknowledged by Mr. Jungers in his statement on plea of guilty, the standard range sentence for child molestation in the first degree, given his offender score, was an indeterminate life sentence with a minimum term of 98 to 130 months. The sentence imposed by the trial court was an indeterminate life sentence with a minimum term of 114 months.

Mr. Jungers makes no effort to analyze his 114 month to life indeterminate sentence under the factors that determine whether a punishment is "cruel" within the meaning of the Washington Constitution. Instead, he argues that allowing H.N.'s wishes to affect his eligibility for a *sentencing alternative* constitutes cruel punishment because it is irrelevant to proportionality. He cites no authority for the proposition that the criteria for a sentencing alternative can render an otherwise constitutional sentence "cruel" punishment.

"'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *In re Pers. Restraint of Williams*, 111 Wn.2d 353, 365, 759 P.2d 436 (1988) (internal quotation marks omitted) (quoting *In re Request*

*of Rosier*, 105 Wn.2d 606, 616, 717 P2d 1353 (1986)).  Mr. Jungers's assignment of error

on cruel punishment grounds does not merit review.

IV.     MR. JUNGERS DOES NOT IDENTIFY A BASIS FOR REVIEW OF THE TRIAL COURT'S
        DISCRETION

Finally, Mr. Jungers argues that even if the trial court followed the proper process,

it was manifestly unreasonable to send a 77-year-old physically infirm person with no

criminal record, who was amenable to treatment, to prison during the COVID-19

pandemic.  The record reveals that when Mr. Jungers was taken into custody, the Grant

County Jail medical clinic initially expressed reservations about its ability to house him.

By February 4, 2020, however, a registered nurse with the clinic wrote a letter "[t]o

whom it may concern," reporting that although Mr. Jungers's "needs are extensive, we

have been able to find accommodations for Inmate Jungers."  CP at 71.

Mr. Jungers characterizes *State v. Sims*, 171 Wn.2d 436, 256 P.3d 285 (2011), as

holding that review of a trial court's decision whether to order a SSOSA is based on an

abuse of discretion standard.  But the Supreme Court held in *Sims*, citing *State v. Osman*,

157 Wn.2d 474, 482 n.8, 139 P.3d 334 (2006), that "[t]he grant of a SSOSA sentence is

*entirely* at a trial court's discretion, so long as the trial court does not abuse its discretion

*by denying a SSOSA on an impermissible basis.*"  *Sims*, 171 Wn.2d at 445 (emphasis

added).  This is consistent with RCW 9.94A.585(1), which provides that a "sentence

within the standard range . . . for an offense shall not be appealed."  The only exception is

39

if the sentencing court fails to comply with procedural or constitutional requirements.

*Osman*, 157 Wn.2d at 481-82.

Mr. Jungers concedes that the trial court went "through the process of examining the key factors in RW 9.94A.670(4) in relation to the evidence." Am. Opening Br. of Appellant at 50. We have rejected his argument that denial of the SSOSA violated his state and federal protection against cruel or cruel and unusual punishment, which is the only constitutional issue he raises. No basis for appealing his standard range sentence is shown.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Staab, J.